## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**JUDY CARMEN MULKEY,**

      Plaintiff,

vs.                                                                      No. CIV 08-1039 RHS

**MICHAEL J. ASTRUE,**
**Commissioner of the**
**Social Security Administration,**

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Plaintiff Judy Carmen Mulkey's ("Mulkey")

Motion to Reverse and Remand for Rehearing, filed April 14, 2009. [Doc. 15]  The Commissioner

of Social Security issued a final decision denying benefits, finding that Mulkey was not disabled and

not entitled to Supplemental Security Income ("SSI") benefits or disability insurance benefits

("DIB").  The Commissioner filed a response to Mulkey's Motion [Doc. 16], and Mulkey filed a

reply [Doc. 17].  Having considered the pleadings submitted by the parties, the administrative record

and the applicable law, the Court grants the motion and remands for additional administrative

proceedings.

I.    **PROCEDURAL RECORD**

On April 6, 2004, Mulkey applied for SSI and DIB [AR 51, 218], alleging her disabling conditions of depression, alcohol dependency, anxiety, and hypertension ("HTN") began on December 24, 2004, and that she became unable to perform full-time work as of that date due to her inability to concentrate or focus.  [AR 51, 106, 110, 137.]  Mulkey's benefit applications were denied at the initial and reconsideration levels. [AR 26-28, 38, 216-17.]  On October 25, 2007, the ALJ conducted an administrative hearing in Albuquerque, New Mexico.  A non-attorney representative was present with Mulkey. [AR 265-291.]  On February 29, 2008, the ALJ issued a decision finding Mulkey not disabled. [AR 11-18.]  Thereafter, Mulkey filed a timely request for review.  On September 11, 2008, the Appeals Council denied Mulkey's request for review and upheld the final decision of the ALJ. [AR 3.]  On November 6, Mulkey filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

Mulkey was born on July 23, 1959, and was 48 years old at the time of the ALJ hearing. [AR 51, 61.] Mulkey initially dropped out of school at age 16 when she became pregnant, but eventually must have completed high school or attained her G.E.D. [AR 198.] She completed two years of college in 1979 and achieved an associates degree in nursing. [AR 168.] She worked as a registered nurse for a number of years, but later allowed her nursing license to lapse. [AR 60, 96, 168, 273.] Mulkey worked in sales at a supermarket deli counter from about January 1999 to December 1999, and as a full-time sales associate with Bed, Bath and Beyond in Colorado Springs, CO, from 2000 to 2004. [AR 59, 60, 96-99.]

Subsequent to filing her application for disability benefits, Mulkey worked from October 2006 to January 2007 as a cashier and sales clerk at K-Mart for approximately 30 hours a week. [AR 271.] From February 2007 to July 2007, she worked as a seamstress for 30 hours a week, "plus or

2

minus." [AR 270.] From September 2007 until the date of the ALJ hearing in late October 2007, Mulkey worked as a seamstress for about 15 hours a week. [AR 269-70.]

Mulkey's earning records indicate she made $39,000 to $40,000 in the years 1997-98, apparently as a registered nurse. [AR 49.] In 1999 and 2000, her earnings dropped to $9425.92 and $12,573.00, respectively. Between 2001 and 2003, she earned $20,969 to $26,261 at Bed, Bath and Beyond. In 2004, her earnings dropped to just under $20,000. [AR 49.] At the ALJ hearing, Mulkey testified that she did not work as much in 2004, after being raped in January 2004. [AR 273.]

Mulkey was married and divorced two times. [AR 51, 52.]  She has a grown daughter in Albuquerque, New Mexico. [AR 80.] In late 2004 or early 2005, Mulkey moved from Colorado Springs to Albuquerque to live with her daughter. [AR 174.]

## II.    STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits her physical or mental ability to do basic work activities . . . .;"[4] at step three,

---

[1]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[3]20 C.F.R. § 404.1520(b) (1999).

[4]20 C.F.R. § 404.1520(c) (1999).

3

the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[5] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[6]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[7] age, education and past work experience, she is capable of performing other work.[8]

At step five, the ALJ can find that the claimant met her burden of proof in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational testimony might be used to demonstrate that the claimant can perform other jobs in the economy. Id. at 669-670.  If, at step five of the process, the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[9]

In this case, the ALJ did not utilize a vocational expert and relied on the grids for his finding of non-disability at step five of the analysis. [AR 17-18.] The Court observes that the ALJ, in possibly a boilerplate recitation of the five-step sequential process, inaccurately stated that at step five, the "claimant generally continues to have the burden of proving disability at this step,"

---

[5]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[6]20 C.F.R. § 404.1520(e) (1999).

[7]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[8]20 C.F.R. § 404.1520(f) (1999).

[9]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

although "a limited burden of going forward with the evidence shifts to the Social Security Administration."  [AR 13.]

The Tenth Circuit Court of Appeals explained if the claimant establishes at step four that she cannot return to her past relevant work, the burden of proof shifts to the Commissioner at step five to show she retains the RFC to perform work in the national economy, given her age, education and work experience.  Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005).  In an unpublished opinion, the Tenth Circuit further stated that "[t]he claimant has no burden on step five."  Stewart v. Shalala, 999 F.2d 548, at *1 (Table, Text in Westlaw), 1993 WL 261958 (10th Cir. Jun. 28, 1993) (citing Thompson v. Sullivan, 987 F.2d 1482, 1491 (10th Cir. 1993)).  Thus, in accordance with pertinent legal standards, the ALJ should revise or clarify his summary of the five-step process.

## III.    STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After "careful consideration of all the evidence" [AR 11], the ALJ denied Mulkey's request for benefits. [AR 11-18.] Notwithstanding Mulkey's recent part-time work history, the ALJ determined she had not been engaged in substantial gainful activity since December 24, 2004, the alleged onset date.  The ALJ also found that Mulkey had severe impairments of depression and alcohol dependency but that none of her impairments or combination of impairments met listing criteria.  The ALJ further determined, "after careful consideration of the entire record," that Mulkey had the residual functional capacity to perform "a wide range of simple, repetitive work at all exertional levels involving primarily things, rather than people." [AR 15.] In so finding, the ALJ found that Mulkey's impairments could reasonably be expected to produce the alleged symptoms but that Mulkey's statements regarding the intensity, persistence and limiting effects of the symptoms were not credible for a number of reasons. [AR 15-16.] The ALJ also declined to afford

great weight to the treating therapists' opinions for reasons explained in the decision.  In addition, the ALJ determined that the evidence as a whole showed that her alcoholism, "while not material, greatly exacerbat[ed] her problems."[10] [AR 17.]

The ALJ decided that Mulkey was not capable of returning to her prior relevant work because those jobs exceeded her RFC. [AR 17.] She was a younger individual, with at least a high school education, and her job skills did not transfer to other occupations within the RFC. [AR 17.] Considering all of the relevant factors, the ALJ found that jobs existed in significant numbers in the national economy that Mulkey could perform.  The ALJ referred to the grids in making this decision and found that Mulkey's nonexertional limitations had not eroded the occupational base.  The ALJ reasoned that Mulkey had been working part-time in a position that fit the RFC he set forth in the opinion, and that she had attended school to find a new profession. [AR 17-18.] In finding that the Mulkey was not disabled at step five, the ALJ did not rely on a vocational expert.

### IV.   MEDICAL HISTORY AND BACKGROUND

Mulkey's medical records begin in late 2003 through part of 2007.  The sole medical record from 2003 may reference only a telephone call to a doctor's office, during which Mulkey stated she needed a therapist for depression and nightmares that had occurred for two years. [AR 193.] Thus, this record indicates Mulkey had nightmares as early as 2001.  Another medical record reports that Mulkey began having "severe nightmares" in 1993 after developing uterine tumors. [AR 174.] Mulkey stated that she had seen at least two therapists about the recurring nightmares but that "no one seems to realize that I throw up after having a nightmare and not after drinking." [AR 174.] However, Mulkey also stated that she drank to soothe or erase problems and to help her sleep.  She

---

[10]This finding appears unnecessary since before engaging in the Drug and Alcohol Analysis and determining whether an addiction is "material," the ALJ must first find the claimant is disabled.

might not drink for three to four weeks, but would start drinking when her nightmares returned. [AR 174.]

In 2004, while working at Bed, Bath and Beyond in Colorado Springs, Mulkey was seeing both a physician and a therapist.  However, none of the 2004 medical records indicate that Mulkey reported having been raped in January 2004.  She later explained she did not report the rape to police because she was embarrassed and also did not think it was worth the "torment" of reporting the rape when the "statistics of somebody like that getting convicted" were not good. [AR 285. ] Later, she did not tell certain therapists about the rape because she had not developed a sufficiently trusting relationship with those therapists.  Mulkey did not discuss the January 2004 rape until a therapy session in mid-2005, although there are no contemporaneous therapy records to confirm her discussion of the rape in 2005.

### *2004 Medical Records*

In late January 2004, Mulkey reported to her physician that she was suffering from extreme anxiety and insomnia.  Dr. O'Donnell's medical notes state "lots of PTSD type [ ? ] from abusive verbal and physical childhood (including mom having her set a fire in house to collect insurance)." [AR 193.] By March 2004, Mulkey was feeling some improvement.  She was sleeping better and had returned to work.  Her sisters and co-workers reported that she was more "her old self." [AR 190.] Mulkey was prescribed anti-depressant and anti-anxiety medications. [AR 193.] In March 2004, she rarely needed the Xanax.  But, in late March, Mulkey had more problems and Dr. O'Donnell prescribed Zyprexa.[11] [AR 189.]

---

[11]"This medication is used to treat certain mental/mood conditions (schizophrenia, bipolar mania). It works by helping to restore the balance of certain natural chemicals in the brain (neurotransmitters).  Some of the benefits of continued use of this medication include feeling less nervous, better concentration, and reduced episodes of hallucinations."   www.webmd.com

In late April 2004, Mulkey was feeling better.  She was sleeping better and not having frightening dreams.  She only needed to take Xanax once since she last saw Dr. O'Donnell.  She was going to the gym occasionally. [AR 188.]

In May 2004, Mulkey went to the emergency room of Penrose Hospital in Colorado Springs. The records note that she was intoxicated and had ingested a bottle of vodka. [AR 204, 210.] Mulkey had been hiding in her closet at home and had had a panic attack.  She was discharged and advised to follow up with a psychiatrist and not to drink alcohol.  The clinical impressions were: paranoia, severe anxiety, nightmares with difficulty sleeping and alcohol abuse. [AR 204.]

In June 2004, Mulkey began seeing a therapist.  She admitted she had a problem with alcohol intermittently.  She stated she did not drink then and did not take illegal drugs.  She had recurrent nightmares from January through May 2004. [AR 201.] Mulkey reported that her second husband took drugs and was physically abusive. [AR 198.] She also stated that her mother told her that her father had been physically abusive, possibly to the mother, although the medical notes are not legible. [AR 198.] A medical record from November 2004 states that Mulkey was struggling over having to see her father soon and that she had found out he abused her. [AR 185.]

In June 2004, Mulkey was placed on high blood pressure medication, but subsequent medical records indicate that problem was resolved and that Mulkey no longer needed the medications. [AR 197, 254.] By December 13, 2004, Mulkey reported she felt fine and her depression was doing well. She also had stopped smoking. [AR 182.]

December 24, 2004 is the alleged onset date of Mulkey's disability, even though the December 13 medical record indicates she was improving. [AR 11, 182.]

### *2005 Medical Records*

In about January 2005 or late 2004, Mulkey moved from Colorado Springs to live with her daughter in Albuquerque. [AR 175.] On January 10, 2005, several weeks after her alleged date of disability onset, Mulkey voluntarily referred herself to Albuquerque Metro Central Intake ("AMCI") for assistance with alcohol abuse. She stated she had used alcohol eight of the last 30 days and had ingested 75 ml. of vodka in four days of eight. Mulkey drank to erase her problems. She drank in the morning and after nightmares to help her get to sleep. Mulkey reported having serious depression, anxiety, tension and trouble concentrating. She was taking an anti-depressant and Zyprexa. [AR 174.] Another AMCI record indicates Mulkey described herself as a social drinker except when she had nightmares, at which point she binged on alcohol. [AR 178.]

In late January 2005, Mulkey began to see therapists at the Counseling and Psychotherapy Institute ("CPI") in Albuquerque. Some of the therapists' notes are illegible [*e.g.,* AR 172], although they clearly document Mulkey's concern with recurring, disturbing nightmares. [AR 172-73.]

In February 2005, Mulkey was seeing therapist Jill Carmack at CPI. Her problem list included repeating nightmares, unemployment and anxiety. She wished to find a job. [AR 170.] On February 10, 2005, Mulkey saw Dr. Claire Smith, whom she told she started drinking when she was 23 or 24 years old and had had a DWI 15 years ago. [AR 168.] She admitted she drank a "couple of shots of vodka" in late 2004 when her uncle died and that she drank some beer at Thanksgiving. Mulkey was considering what types of jobs she might apply for at this time. She had completed some graphic arts course work and wondered about newspaper work. [AR 169.]

On April 6, 2005, Mulkey submitted her SSI and DIB applications. [AR 51, 218.] A day later, she saw Dr. Smith. The medical record notes that she was not able to fill a prescription for

Lamictal.[12]  Mulkey was contemplating return to work.  Her prescriptions for Zoloft, Zyprexa and Lamictal were renewed. [AR 166.]

On April 18, 2005, disability services conducted a telephone interview with Mulkey.  The interviewer did not notice any problems except with Mulkey's concentration. The interviewer also noted that Mulkey "giggled" throughout the whole interview.  The interviewer recommended that "because of her alcoholism–determination needed for capability." [AR 108.]

On April 22, 2005, Mulkey saw her CPI therapist and reported that she was overjoyed at having her own room in a new apartment.  She appeared happier. [AR 165.] On April 27, Mulkey told her therapist that she wanted to work and go to school.  She was animated. [AR 165.]

On a disability form, Mulkey stated that she usually awoke between 8 and 8:30 a.m.  She washed up, ate, went to her appointments, had a snack for lunch, cleaned house, did the laundry, read, ate dinner and watched television. [AR 88.] Mulkey could prepare regular meals and do yard/house work.  She went outside every day, walked and used public transportation. [AR 91.] She did not drive and had not driven in ten years.  She did not mention the previous DWI in this form.  She could pay her bills but sometimes had problems keeping up with them.  She tended to avoid family and friends now. [AR 92.]  She often could not fall asleep until midnight. [AR 88.]  She used to be able to go out more socially and play sports but she no longer could do those things.  She was having repetitive nightmares where she was being killed.  She noted that counseling was helping her. [AR 95.]

On May 10, 2005, Mulkey told Dr. Smith that she was feeling really well.  She was getting help form Vocational Resources.  The doctor decided to discontinue the Zyprexa. [AR 166.] On June

---

[12]"Lamotrigine (lamictal) is used alone or with other medications to prevent or control seizures (epilepsy). It may also be used to help prevent the extreme mood swings of bipolar disorder in adults."  www.webmd.com

3, 2005, Mulkey reported that a girlfriend had come to visit her and was amazed at how well Mulkey was doing.  Mulkey attended a family reunion that she said went well. [AR 164.]

On June 23, 2005, Mulkey's daughter Veronica filled out a third-party disability report. [AR 80.] Veronica was living with Mulkey since the beginning of 2005.  Veronica described her mother as having insomnia, horrific nightmares, anxiety, and paranoia. [AR 80-81.] At times, Mulkey shook like a frightened child, would not leave her room, and would not change her clothes. [AR 81.] Veronica noted that Mulkey would not bathe, groom, or eat during these "episodes," and that sometimes she "wetted" herself. [AR 81.] Veronica described her mother as either being "normal or completely unable to do anything – no in between." [AR 84.] Interestingly, Veronica never described her mother as having a drinking problem or that she was a binge drinker.  Instead, Veronica wrote that she had no indication when one of these episodes might occur. [87.] She did state that Mulkey did not drive because of a DWI and that her license was suspended at some point until she completed community service work. [AR 83.]

On July 10, 2005, Leroy Gabaldon, Ph.D, a state agency psychologist, reviewed the record and found Mulkey had mild restrictions as to daily activities, maintaining social functioning, and maintaining concentration, persistence and pace.  There were no restrictions found as to episodes of decompensation.  While Mulkey was depressed, she was able to care for her personal needs, relate to others and enjoy house activities. [AR 149-161.] Another disability services employee confirmed these findings. [AR 141.]

When Mulkey filled out another disability report for her appeal, she stated that she was going to UNM for special job training.  She rode a bike to her UNM classes and rode the bike at other times as well. [AR 254.] Her medications were being changed which confused her.  Mulkey stated she was trying to attend school and "stay under control" during this time. [AR 68-69, 125-28.] On

one form, Mulkey wrote that she had several days in July and August when she could not get out of bed. [AR 77, 129.] Yet, there are no contemporaneous medical records to confirm these problems.

On October 28, 2005, Mulkey saw Dr. Binu Sugunan, an internist at UNM, to establish a primary care doctor-patient relationship. She reported an old history of hypertension that no longer required medication. She had suffered from night terrors and was taking Zoloft, Zyprexa and Lamictal. Mulkey told Dr. Sugunan, that "for the past one year she has not had any depression."[13] She also stated since moving to Albuquerque in early 2005, she had not had any more night terrors. She was interested in stopping the medications. Dr. Sugunan decided to stop the Zyprexa and continue the Zoloft and Lamictal. [AR 252-53.]

### *2006 Medical Records*

On February 3, 2006, Mulkey again saw Dr. Sugunan. This record notes that Mulkey was living in Denver and had moved to Albuquerque over six months ago. [AR 248.] It is not clear from the record what occurred in Denver or why Mulkey may have moved to Denver. Dr. Sugunan decided not to renew her prescription of Lamictal. Thus, she was taking only an anti-depressant. The record notes Mulkey was seeing a therapist at CPI, but there are no contemporaneous therapy records. [AR 248-49.]

As of October 2006, Mulkey had started to work as a cashier at K-Mart and was working about 30 hours a week.

On December 6, 2006, Mulkey saw Dr. Sugunan, who stated Mulkey was taking Zoloft and Lamictal but that she had not been taking the Lamictal because this may have caused her headaches.

---

[13]While Mulkey stated she had had no problems with depression or nightmares since early 2005 or longer, she contradicts herself in another medical record where she stated she could not get out of bed for several days in July or August 2005.

According to Mulkey, she had a history of depression and night terrors that had resolved after moving to Albuquerque 1.5 years ago. [AR 235.]

### *2007 Medical Records*

On September 5, 2007, Mulkey was seen by a different medical provider at UNM.  She was taking Zoloft and Clonazepam then for anxiety.  The record notes that Mulkey "has no recent night terrors."  She currently stated she was doing fine.  "The patient has no current active issues." [AR 231.]

On October 27, 2007, the ALJ hearing was held in Albuquerque. [AR 265-291.]   Mulkey stated she had been working 15 hours a week from September 2007 as a seamstress.  Earlier in 2007, she worked 30 hours a week as a seamstress, and in October 2006 to January 2007, she worked at K-Mart for 30 hours a week.  At the hearing, Mulkey testified about her rape in 2004.  She stated two men were involved, who lived in the same apartment building.  [AR 273, 276.] Mulkey drank after the rape to avoid remembering what happened.  She drank whatever was the "strongest and fastest" so that she could pass out and not think about it. [AR 276.]

There were months when Mulkey said she did not drink. [AR 277.] She had been trying to go to AA meetings in the morning where she was making good progress.  She was still going to AA meetings as of October 2007. [AR 280.] Mulkey testified she could not work with men in the same room now. [AR 286.] The ALJ asked when Mulkey had her last drink, and Mulkey reported the past Sunday when she had "one small bottle" because she was concerned about the ALJ hearing. [AR 289.]

On one 2007 disability form, Mulkey wrote that she had been treated or hospitalized by "Metropolitan Alcohol Treatment Services in Albuquerque for eight days in July 2007." [AR 58.] There are no contemporaneous treatment records to confirm this hospitalization.  Moreover, in 2007,

14

it appears that Mulkey was doing well. [AR 231.] Mulkey may have been referring to a different year, although the notation [AR 58] is unclear.

On November 20, 2007, Mulkey's treating therapist, Regina Laselute, a licensed mental health counselor, filled out a Medical Source Statement of Ability to Do Work-Related Activities (Mental). [AR 261.] Ms. Laselute found slight limitations in Mulkey's ability to understand short, simple instructions and carry out short, simple instructions.  She determined Mulkey had marked limitations in carrying out detailed instructions and in making judgments in simple work-related decisions.  Mulkey was unable to concentrate on simple duties if she felt overwhelmed by work duties.  There were no limitations on her ability to interact appropriately with people.  Laselute found moderate limitations in her ability to respond appropriately to changes in the routine work setting and marked limitations in responding to work pressure. [AR 262.] No corresponding therapy records from Laselute were provided.

In response to the question of whether alcohol use contributed to any of the limitations, the therapist wrote that Mulkey used alcohol as a coping mechanism for increased anxiety.  The limitations, however, were present despite alcohol use due to feelings of anxiety.   [AR 263.]

### *2008 Medical Records*

On January 15, 2008, CPI submitted a written treatment summary for Mulkey that was signed by Regina Laselute, and a clinical supervisor, Dr. Ken Wells.  [AR 134.] The summary states Mulkey was seen at CPI from January 2004, although this is a typographical error.  Mulkey did not move to Albuquerque and begin treatment at CPI until 2005.

The summary statement provides that Mulkey sought treatment for alcohol abuse, anxiety and depression.  She also reported experiencing nightmares.  The summary describes her initial treatment with therapist Jill Carmack and states Mulkey was withdrawn and somewhat resistant with

15

Carmack.  [AR 134.] Carmack left the agency, at which time Gloria Rodosevich became Mulkey's therapist.  According to the treatment summary, for the first time, Mulkey established a trusting therapeutic relationship with Ms. Rodosevich in mid-2005 and disclosed the rape from January 2004.  In August 2006, Ms. Rodosevich left CPI, and Ms. Laselute became Mulkey's therapist. [AR 134.] Ms. Laselute wrote that while Mulkey reported a marked decrease in nightmares and a sense of closure about the rape, she continued to exhibit PTSD symptoms that presented as anxiety and depression.  [AR 134.] CPI advised Mulkey to be more proactive and also to limit her work hours.

Ms. Laselute supplied another Medical Source Statement Regarding Function, dated January 14, 2008. [AR 135-36.] She found marked limitations in Mulkey's abilities to understand, carry out and remember simple instructions in a work setting, marked limitations in her ability to make simple work-related judgments and decisions, marked limitations in her ability to respond appropriately to supervision, coworkers and work situations and moderate limitations in her ability to deal with changes in a routine work setting. [AR 135-36.] There are no contemporaneous therapy records from Ms. Laselute or Ms. Rodosevich.  Furthermore, it is unclear why Ms. Laselute supplied differing, if not contradictory, medical source statements only a few months apart.

V.   **DISCUSSION**

A.   Alleged Legal Error

Mulkey argues that the ALJ committed four errors in denying Mulkey's applications for disability benefits: (1) the ALJ failed to prepare and attach a detailed exhibit list to his written decision; (2) the step five finding was unsupported by substantial evidence; (3) the ALJ failed to afford the treating health care professional's opinion  the weight to which it was entitled; and (4) the ALJ's credibility determination was unsupported by substantial evidence and contrary to law. [Doc. 15, pp. 3-4.]

16

B.    ALJ's Failure to Attach Detailed Exhibit List to Decision

Mulkey argues that the ALJ failed to attach a detailed exhibit list to his written decision denying benefits and that this omission was a denial of her due process rights.  In support of this position, Mulkey contends that the SSA's Hearings Appeals & Litigation Law Manual ("HALLEX") mandates that a detailed exhibit list be prepared in final form and placed in the claim file. [Doc. 16, p. 4] (*citing* HALLEX I-2-1-20).

Mulkey further asserts that the importance of the detailed exhibit list is twofold.  First, Mulkey claims it is impossible, in this case, to know exactly which evidence the ALJ relied upon because he sometimes failed to specifically discuss the evidence.  As an example, Mulkey explains that when the ALJ discussed the CPI Treatment Summary, signed by both supervisor Dr. Well and Therapist Laselute [AR 134], he did not mention that Dr. Wells co-authored the report.  Second, Mulkey argues that it is impossible to know whether evidence she submitted was made part of the record unless the ALJ specifically referred to it.[14]

The Court rejects Mulkey's assertion of error based on the ALJ's failure to file a "detailed" exhibit list with the written decision.  The ALJ noted the exhibits at the beginning of the hearing, as consisting of Exhibits A1-through F81. [AR 267.] Mulkey's representative had no objection.  In addition, even though the ALJ provided a "drop-dead" date of November 23, 2007, to submit additional medical records or evidence, the ALJ accepted reports submitted by Mulkey's representative as late as January 2008. [AR 1, 133.] A list of these exhibits is contained as part of the record, and the ALJ stated he considered all of the evidence. [AR 1, 15.]

---

[14]The Court admits that it would be easier to determine where certain information in the record is located if the exhibit list were more detailed.  For example, when the ALJ stated there was evidence by the claimant of having a partner in 2004 and 2005, the Court found no such reference in the record.  The ALJ provided no cite to the record. [AR 16.]

Moreover, Mulkey does not provide any supporting legal authority to demonstrate that the SSA's procedural manual carries the force of law or that it is binding. Rather, it appears to be an internal procedural manual. The Court located only rare mention of HALLEX by the Tenth Circuit Court of Appeals, and no reference to the manual as binding legal authority. Mulkey's reliance on a single unpublished opinion by the Eastern District of New York is unavailing. In that case, the district court was primarily remanding for reasons other than those concerning HALLEX procedures. *See* Henry v. Astrue, 2008 WL 2697317 (E.D.N.Y. July 3, 2008).

Finally, the fact that the ALJ mentioned the CPI treatment summary note but did not specifically reference Clinical Supervisor Ken Well's co-signature is of no moment. There was no evidence presented that Dr. Wells treated Mulkey or ever met with her in the course of her therapy at CPI.

C.      ALJ's Reliance on the Grids at Step Five without Vocational Testimony

More persuasive is Mulkey's argument that the ALJ erred in failing to obtain vocational testimony at step five and that substantial evidence does not support the step five findings. At step two, the ALJ determined that Mulkey's depression and alcohol dependency were "severe impairments." By definition, "[a]n impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities." [AR 12.] Thus, the ALJ's step two findings amounted to a determination that Mulkey suffered from nonexertional impairments that significantly limited her ability to perform basic work activities. To decide at step five, without vocational or other similar testimony, that Mulkey's severe nonexertional limitations did not erode the occupational base is not supported by substantial evidence.

The ALJ correctly states that if the claimant has solely nonexertional impairments, as is true here, the grids "provide[] a framework for decision-making." [AR 18.] The Commissioner argues that "[a]t step five of the sequential evaluation process, the ALJ relied upon Grid rule 204.00 as a framework to find that Plaintiff was not disabled." [Doc. 16, p. 11.] The Commissioner further asserts that "[b]ecause Plaintiff had no exertional limitations, the unskilled jobs at all exertional levels constituted her potential occupational base, and, thus Grid rule 204.00 provided a proper framework for finding Plaintiff not disabled." [Doc. 16, p. 12.]

The Commissioner expressly argues that the ALJ relied on the grids as a framework in reaching the nondisability finding.  The ALJ acknowledged he must use the grids as a framework when nonexertional limitations are the sole impairments and, therefore, implied that he relied on the grids as a framework in reaching his decision.  In the absence of vocational testimony or other similar testimony, the Court determines that the ALJ conclusively relied upon the grids in finding Mulkey not disabled.  *See* Ramirez v. Astrue, 255 F. App'x 327, 330 n. 1, 2007 WL 4124475 (10th Cir. Nov. 20, 2007) (observing that while the ALJ stated in his written decision that he used the grids only as a "framework," the fact that he failed to develop any vocational testimony indicated he "in fact applied the grids conclusively to 'direct' a finding of 'not disabled.'") Here, the ALJ neither had a VE on hand at the administrative hearing, nor did he explain in his decision why vocational testimony was unnecessary.

The Commissioner is correct in arguing that vocational testimony need not always be presented when a claimant has nonexertional impairments.  In other words, the mere presence of a nonexertional impairment does not automatically preclude the use of grids.  Instead, the nonexertional impairment must interfere with the ability to work.  *See* Ray v. Bowen, 865 F.2d 222, 225 (10th Cir. 1989).  "[A] nonexertional impairment can have a negligible effect on the range of

jobs available." Talbot v. Heckler, 814 F.2d 1456, 1465 (10th Cir. 1987). An ALJ may conclusively

rely on the grids if he determines that the claimant has no significant nonexertional impairment and

the claimant can perform most of the jobs at a particular exertional level, so long as these findings

are supported by substantial evidence. Thompson v. Sullivan, 987 F.2d at 1488.

However, "[a]utomatic application of the grids is appropriate only when a claimant's RFC,

age, work experience, and education precisely match a grid category." Gossett v. Bowen, 862 F.2d

802, 806 (10th Cir. 1988) (internal citations omitted). The grids will not apply in all cases and "some

claimants may possess limitations that are not factored into the guidelines." Heckler v. Campbell,

461 U.S. 458, 462 n. 5 (1983). "[R]esort to the grids is particularly inappropriate when evaluating

nonexertional limitations such as pain and mental impairments." Hargis v. Sullivan, 945 F.2d 1482,

1490 (10th Cir. 1991) (internal citation omitted). In cases where nonexertional limitations exist, "the

grids generally may serve only as a framework to determine whether sufficient jobs exist within a

claimant's range of RFC." Id.

Moreover, when a claimant's RFC is diminished by nonexertional impairments, "the

Secretary must produce expert vocational testimony or other similar evidence to establish the

existence of jobs in the national economy." Hargis, 945 F.2d at 1491 (internal citation omitted).

"A severe mental impairment is such a nonexertional impairment." Id.

In this case, the ALJ determined that Mulkey's testimony as to the intensity, persistence, and

limiting effects of the alleged symptoms was not entirely credible. [AR 16.] The Court finds that

substantial evidence supports some of the ALJ's credibility findings. However, the Court does not

find substantial evidence to support the ALJ's finding that Mulkey's severe impairments of

depression and alcohol dependence "have not eroded the occupational base." [AR 18.] Similarly,

the Court does not find substantial evidence to support the ALJ's conclusion Mulkey could perform only simple, repetitive work did not erode the occupational base.

In support of his ultimate conclusion of non-disability, the ALJ apparently relied on the fact that eleven years ago or even earlier, Mulkey was able to work as a registered nurse, "a very demanding job despite having nightmares." [AR 16.] He also noted that Mulkey was attending school and was working part-time in a position that fits the demands of the RFC assigned by the ALJ. [AR 18.]

The ALJ does not cite any evidence, however, to support a finding that Mulkey can perform full-time work in light of her severe depression or severe alcohol dependence, or evidence that demonstrates why her severe impairments do no erode the occupational base. Thus, the Court determines that substantial evidence does not support the ALJ's step five findings and that the case must be remanded for additional administrative proceedings.[15]

## VI.   CONCLUSION

Upon remand, the ALJ must consider whether a vocational expert should be utilized in light of the severe nonexertional impairments. If the ALJ again decides that he may conclusively rely on the grids at step five, he should explain why vocational testimony is unnecessary under the circumstances of this case. He should also properly identify whether he relies on the grids as a framework for his decision or if he conclusively relies on the grids.

---

[15]The Court does not find persuasive the Commissioner's reliance on Evans v. Chater, 55 F.3d 530, 532-33 (10th Cir. 1995), for the proposition that an ALJ may rely exclusively on the grids without vocational testimony if a claimant can perform a substantial majority of the work at the designated exertional level. [Doc. 16, p. 13.] Evans is notable for the fact that vocational testimony was developed after the ALJ determined the claimant had severe impairments of pain step two. Id. at 531. Nor does Castellano v. Sec'y of Health & Human Servs., 26 F.3d 1027 (10th Cir. 1994) compel a different result, where the treating physician's notes indicated the claimant was able to return to some kind of light or sedentary work.

The Court does not reach Mulkey's additional arguments supporting remand, other than to state on remand, the ALJ should determine whether a licensed medical health counselor is an acceptable medical source in accordance with 20 C.F.R. §§ 404.1513, 416.913 and decide what weight to assign the counselor's opinions consistent with regulatory criteria.

Likewise, Mulkey should determine whether the treatment notes of her therapists would help support her claim of disability.  The lack of those notes and the conflicting medical source statements by her therapist do not assist her in proving she has a disability.

IT IS THEREFORE ORDERED that Plaintiff Mulkey's motion for remand is GRANTED and that this matter is REMANDED for additional administrative hearings as described herein.  In remanding this matter, the Court does not indicate any view on the strength of Plaintiff's case.  In other words, no particular result is dictated upon remand.


ROBERT H. SCOTT
UNITED STATES MAGISTRATE JUDGE